# EXHIBIT A



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL:)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:** DYNAMIC LEDGER SOLUTIONS, INC., a
*(AVISO AL DEMANDADO:)* Delaware corporation,

Additional Parties Attachment Form is Attached

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Andrew Baker, individually and on behalf of all others similarly situated

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
*(El nombre y dirección de la corte es):* San Francisco Superior Court

400 McAllister St, San Francisco, CA 94102

**CASE NUMBER:**
*(Número del Caso):* **CGC-17-562144**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
James Taylor-Copeland, 501 W. Broadway Suite 800, San Diego CA 92101, 202-553-7860

DATE: 10/25/2017     **OCT 25 2017**     Clerk of the Court, by _____ , Deputy
*(Fecha)*     *(Secretario)*     *(Adjunto)*

NEYL WEBB

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☒ on behalf of *(specify)*: Dynamic Ledger Solutions, Inc.

    under: ☒ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)      ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)      ☐ CCP 416.90 (authorized person)
           ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Andrew Baker v. Dynamic Ledger Solutions, Inc. et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff  ☑ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

Delaware corporation, THE TEZOS
FOUNDATION, a Swiss foundation,
KATHLEEN BREITMAN, an individual,
ARTHUR BREITMAN, an individual, JOHANN
GEVERS, an individual, STRANGE BREW
STRATEGIES, LLC, a California limited
liability company, and DOES 1 through 100,
inclusive,

Page  1  of  1

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| James Q Taylor-Copeland (SBN 284743)<br>Taylor-Copeland Law<br>501 W. Broadway Suite 800<br>San Diego, CA 92101<br>TELEPHONE NO.: 619-400-4944    FAX NO.:<br>ATTORNEY FOR *(Name):* Andrew Baker | ENDORSED<br>FILED<br>San Francisco County Superior Court<br><br>OCT 2 5 2017<br><br>CLERK OF THE COURT<br>NEYL WEBB<br>BY:_____ Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Andrew Baker v. Dynamic Ledger Solutions, Inc., et. al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER:<br>CGC - 17 - 562144 |
|---|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE:<br><br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation**
**(Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[✓] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [✓] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [✓] monetary  b. [✓] nonmonetary; declaratory or injunctive relief  c. [✓] punitive
4. Number of causes of action *(specify):* 6
5. This case [✓] is [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 10/25/2017

James Taylor-Copeland
(TYPE OR PRINT NAME)                    ▶ _____ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

BY FAX
ONE LEGAL LLC

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |
|---|---|---|

1    James Q. Taylor-Copeland (SBN 284743)
      james@taylorcopelandlaw.com
2    **TAYLOR-COPELAND LAW**
      501 W. Broadway Suite 800
3    San Diego, CA 92101
      Tel:  619-400-4944
4

5    *Attorney for Individual and Representative*
      *Plaintiff Andrew Baker*
6

              ENDORSED
              **F I L E D**
      San Francisco County Superior Court

            OCT 2 5 2017

      CLERK OF THE COURT
      BY:     NEYL WEBB
                  Deputy Clerk

7         SUPERIOR COURT OF THE STATE OF CALIFORNIA

8      COUNTY OF SAN FRANCISCO, CIVIC CENTER COURTHOUSE

9

10    ANDREW BAKER, individually and on behalf
      of all others similarly situated

11                 Plaintiff,

12    v.

13    DYNAMIC LEDGER SOLUTIONS, INC., a
      Delaware corporation, THE TEZOS
14    FOUNDATION, a Swiss foundation,
      KATHLEEN BREITMAN, an individual,
15    ARTHUR BREITMAN, an individual, JOHANN
      GEVERS, an individual, STRANGE BREW
16    STRATEGIES, LLC, a California limited
      liability company, and DOES 1 through 100,
17    inclusive,

18                 Defendants.

19

Case No. **CGC - 17 - 562144**

**CLASS ACTION**

**COMPLAINT FOR:**

**(1) UNREGISTERED OFFER AND SALE
OF SECURITIES IN VIOLATION OF
SECTIONS 5(a) AND (c) OF THE
SECURITIES ACT**

**(2) FRAUD IN THE OFFER OR SALE OF
SECURITIES IN VIOLATION OF
SECTION 17(a)(1) OF THE SECURITIES
ACT**

**(3) FRAUD IN THE OFFER OR SALE OF
SECURITIES IN VIOLATION OF
SECTIONS 17(a)(2) AND (3) OF THE
SECURITIES ACT**

**(4) FALSE ADVERTISING (BUSINESS
AND PROFESSIONS CODE SECTIONS
17500, ET SEQ.)**

**(5) UNFAIR COMPETITION (BUSINESS
AND PROFESSIONS CODE SECTIONS
17200, ET SEQ.)**

**(6) ALTER EGO LIABILITY**

**JURY TRIAL DEMANDED**

**DEMAND EXCEEDS $25,000**

1

**COMPLAINT**

Plaintiff Andrew Baker, individually and on behalf of all others similarly situated ("Plaintiffs") complains against defendants Dynamic Ledger Solutions, Inc. ("DLS"), the Tezos Foundation ("Tezos Foundation"), Kathleen Breitman, Arthur Breitman, Johann Gevers (collectively, "Tezos Defendants"), Strange Brew Strategies, LLC ("Strange Brew") and Does 1-100 (collectively, "Defendants") as follows:

## SUMMARY OF ACTION

1.     This action involves a scheme by Defendants to raise hundreds of millions of dollars through an "initial coin offering" ("ICO") in violation of the registration and anti-fraud provisions of the federal securities laws, as well as state false advertising, and unfair competition laws.

2.     The last two years have seen the explosive growth of blockchain technology and the value of cryptocurrencies. A blockchain is a decentralized digital ledger (such as bitcoin) on which transactions (or other information) are recorded and added in chronological order.   It allows participants to keep track of digital currency transactions (or information exchanges) without central record keeping.

3.     There are now hundreds of different cryptocurrencies worth more than $150 billion—up from just $12.5 billion a year ago.  These currencies use encryption techniques to regulate the generation of units of currency and facilitate and verify the transfer of funds without the need for an intermediary, like a bank.

4.     Taking advantage of this rapid growth, many blockchain and cryptocurrency startups have attempted to skirt fundraising regulations by raising funds though an ICO.  In an ICO, tokens are sold to consumers in exchange for legal tender or other cryptocurrencies (most often Bitcoin and Ethereum).  These tokens generally give the purchaser various rights on the blockchain network and resemble the shares of a company sold to investors in an initial public offering.  Unfortunately, these ICOs have become a magnet for unscrupulous practices and fraud.

5.     Against this backdrop, in July 2017, Defendants conducted an ICO in which they sold 607,489,040.89 tokens (dubbed "Tezzies" or "XTZ") in exchange for digital currency worth approximately $232 million at the time. This digital currency is now worth about twice that—

approximately $475 million.  The Tezzies would purportedly allow their holders to facilitate payments or execute smart contracts on the Tezos blockchain network, and to control the rules of the Tezos network by voting on upgrades.

6.    The Tezzies therefore derive their value from the usefulness and popularity of the Tezos network.  As the Tezos network was not yet working, investments in Tezzies were investment in a common enterprise, with an expectation of profits, solely from the efforts of others—namely, the Breitmans, DLS and the Tezos Foundation.

7.    On or about July 25, 2017 the U.S. Securities and Exchange Commission ("SEC") issued a Report indicating that many ICOs, and particularly those with the above characteristics are securities under the Securities Act.  A true and correct copy of this report is attached as **Exhibit A.**

8.    However, Defendants did not register these Tezzies with the SEC, and many of the representations Defendants made regarding the status of the Tezos project in the run up to the ICO were either exaggerations or outright lies.

9.    Despite claiming before the ICO that the Tezos network would likely be up and running by September 2017, defendant Arthur Breitman now concedes that it will not be ready until February 2017 at earliest.  It has also become clear that the funds collected by the Tezos Foundation in the ICO are not being allocated as ICO participants were told they would.

**PARTIES**

10.    Lead Plaintiff Andrew Baker is an individual who at all times mentioned, was and is a resident of San Diego, California.  Baker purchased Tezzies from Defendants during the Tezos ICO.

11.    Plaintiff is informed and believes, and based thereon alleges, that Defendant DLS is a Delaware corporation with its principal place of business in San Francisco, California.  It is owned and controlled by defendants Kathleen and Arthur Breitman, and according to the Tezos website, it owns all of the Tezos-related intellectual property.

3

**COMPLAINT**

12.     Plaintiff is informed and believes, and based thereon alleges, that Defendant Tezos Foundation is a Swiss foundation established in order to collect the ICO funds and skirt U.S. regulations.

13.     Plaintiff is informed and believes, and based thereon alleges, that Defendant Kathleen Breitman is an individual who at all times mentioned was and is a California resident. Kathleen Breitman is the CEO of DLS.

14.     Plaintiff is informed and believes, and based thereon alleges, that Defendant Arthur Breitman is an individual who at all times mentioned was and is a California resident.  Arthur Breitman was previously the CEO of DLS, and is currently its CTO.

15.     Plaintiff is informed and believes, and based thereon alleges, that Defendant Johann Gevers is an individual who is a Swiss national.  Gevers is the president of the Tezos Foundation.

16.     Plaintiff is informed and believes, and based thereon alleges, that Defendant Strange Brew Strategies, LLC is a California limited liability company with its principal place of business in San Francisco, California.

17.     At all times mentioned herein, each of the defendants named herein, including DOES 1 through 100 were the co-conspirators, agents, representatives, alter egos, employers, and/or joint venturers of the other defendants, and, in doing the acts and things herein alleged, were acting within the course, scope, and authority of said agency, service, or employment with knowledge, permission, and consent of the other defendants and each of them.

18.     Plaintiff alleges on information and belief that DOES 1-100, inclusive, were individuals, corporations, companies, partnerships, or other business entities. DOES 1-100 were co-conspirators with, or alter egos of, other Defendants in the violations alleged in this Complaint and performed acts or made statements in furtherance thereof.  Plaintiffs are presently unaware of the true names and identities of DOES 1-100.  Plaintiffs will amend this Complaint to allege the true names of the DOE defendants when they are able to ascertain them.

## CLASS ACTION ALLEGATIONS

19.   This suit is brought as a class action pursuant to section 382 of the California Code of Civil Procedure, on behalf of a class of:

> **All natural persons who purchased Tezzies during the ICO conducted by Defendants in July 2017. Excluded from the class are: retail employees; corporate officers, members of the boards of directors, and senior executives of Defendants; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.**

20.   Plaintiff does not, as of yet, know the exact size of the class. However, based on records found on the Tezos website, Plaintiff believes that there are approximately thirty thousand class members. The members of the class are thus so numerous that joinder of all members is impracticable.

21.   Questions of law and fact common to the class that predominate over any questions that may affect only individual members of the class, including, but not limited to:

(a)   Whether the Tezzies offered for sale during the Tezos ICO constitute securities under the Securities Act;

(b)   Whether the Tezos ICO violated the registration provisions of the Securities Act;

(c)   Whether the Tezos ICO violated the anti-fraud provisions of the Securities Act;

(d)   Whether the conduct of Defendants violated California False Advertising Law;

(e)   Whether the conduct of Defendants violated the Unfair Competition Law;

(f)   Whether statements made by Defendants before and during the Tezos ICO misrepresented material facts about the Tezos network and the value of Tezzies; and

(g)   The type and measure of damages suffered by Plaintiff and the Class.

22.   Lead Plaintiff will fairly and adequately protect the interests of the class because Plaintiff's claims are typical and representative of the claims of all members of the class. Lead Plaintiff suffered injury in fact when he purchased 5,000 Tezzies for one Bitcoin (then valued at approximately $2,800).

23.   Lead Plaintiff's claims are typical of the claims of all class members, as all members of the class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws, and state false advertising and unfair competition laws.

24.     There are no unique defenses that may be asserted against Lead Plaintiff individually, as distinguished from the other members of the class, and the relief sought is common to the class.  Plaintiff is typical of other members of the class, does not have any interest that is in conflict with or is antagonistic to the interests of the members of the class, and has no conflict with any other members of the class.  Plaintiff has retained competent counsel experienced in securities, consumer protection, and class action litigation to represent himself and the class.

25.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to redress individually the wrongs done to them.  In the absence of a class action, Defendants will retain the benefits of their wrongful conduct.

### THE BEGININGS OF TEZOS

26.     In the summer of 2014, Arthur Breitman, a self-described crypto-anarchist, released two papers online that presented his concept for the Tezos blockchain network under the pseudonym "L. M Goodman."

27.     In early 2015, Arthur Breitman told others that he wanted to start a business based on Tezos, but did not want to be publicly associated with it at the time.  He expressed concern that his activities might conflict with his employment at Morgan Stanley.

28.     Also in early 2015, Arthur Breitman wrote a "Tezos Business Plan" which projected that if the company survived 15 years it would be worth between two billion and twenty billion dollars.  The budget called for paying Arthur Breitman $212,180 in salary by year three.

29.     In August 2015, Arthur Breitman established defendant DLS and listed himself as CEO.

30.     Although, the U.S. Financial Industry Regulatory Authority (FINRA) requires registered securities professionals, such as Arthur Breitman, to provide prior written notice to their

1  employer to conduct outside business activities if there is "reasonable expectation of

2  compensation," Breitman did not report any "other business activities."

3      31.    The 2015 business plan called for raising $5 million to $10 million over two to three

4  years. Breitman pitched "Tezos Inc." in 2015, but failed to attract backers at the time.

5              **THE LEAD UP TO THE TEZOS ICO**

6      32.    In April 2016, Arthur Breitman left Morgan Stanley, and by that September, he and

7  his wife Kathleen Breitman started working on a new strategy for Tezos. Conducting an online

8  fundraiser to distribute digital tokens ("Tezos ICO"), whose holders would maintain the Tezos

9  blockchain.

10     33.    According to the Tezos.com website, over the next six months, they received

11  $612,000 from ten early backers, including several cryptocurrency hedge funds.

12     34.    To conduct the ICO, the Breitmans helped to create the Tezos Foundation in Zug,

13  Switzerland. The Foundation is seeking not-for-profit status. According to documents on the

14  Tezos website, the plan was for the Foundation to raise money via the ICO, then acquire DLS, the

15  Breitman-controlled company that has been developing Tezos.

16     35.    In June 2017, Kathleen Breitman told Reuters that she and Arthur Breitman opted to

17  use a foundation based in Zug because Switzerland has "a regulatory authority that had a sufficient

18  amount of oversight *but not like anything too crazy*." (emphasis added)

19     36.    Months after the conclusion of the ICO, Kathleen Breitman would describe Swiss

20  regulators as "accommodating," and when asked to compare them to the SEC would say: "I don't

21  know much about how to deal with the SEC, but in general I think its very easy for me to get an

22  opinion on what we ought to do in Switzerland, here in the US its less obvious how these digital

23  assets are registered and treated."

24     37.    The Tezos website describes the relationship between DLS and the Tezos

25  Foundation. Characterizing DLS as "a US-based company currently controlled by its founders,

26  Kathleen & Arthur Breitman. It owns all of the Tezos-related intellectual property (IP) including

27  the source code of the Tezos cryptographic ledger, logos, and trademark applications associated

28

7<br>**COMPLAINT**

with the name Tezos, domain names, and goodwill arising from a set of a relationships with several contractors and potential customers in the financial technology market."

38.     The website notes that "The Tezos Foundation (the Foundation) is a Swiss foundation based in Zug. Its directors are Johann Gevers, Diego Ponz, and Guido Schmitz-Krummacher. As a legal entity, it operates independently from DLS, though DLS advises the Foundation closely on technology."

39.     It explains that the Foundation and DLS "have negotiated a contractual agreement in which the Foundation will acquire DLS and release its IP under a free software license." The Foundation will "also acquire DLS' existing business relationships with contractors and potential customers, as well as its trademark applications and domain names. This transaction is structured as an earnout, which means the price paid will depend on future performance metrics."

40.     The ICO was originally scheduled to be held in May, but was delayed, and the project was running out of cash. So, Kathleen Breitman went to Tim Draper, the founding partner of Silicon Valley venture capital firm Draper Associates. He invested $1.5 million through his firm, Draper Associates, which included taking a minority stake in DLS, the company that controls the Tezos source code.

## FALSE REPRESENTATIONS REGARDING THE STATUS OF THE TEZOS NETWORK

41.     In the months leading up to the Tezos ICO, Defendants made numerous statements exaggerating the progress of the Tezos Network, misrepresenting the relationship between Defendants (and particularly between DLS and the Tezos Foundation), and misrepresenting how funds raised during the ICO would be spent.

42.     The Breitmans hired defendant Strange Brew Strategies, a California public relations firm, to help promote the ICO.  Strange Brew pitched a story regarding Tezos to Reuters and Reuters wrote a news story on May 5 about Tim Draper's involvement in the project.

43.     In pitching the story to Reuters, John O'Brien, a principal of Strange Brew, made false claims about Tezos' progress. He wrote: "The applications of Tezos, ranging from derivatives

settlement to micro-insurance, are real and recognized by industry giants. Ernst & Young, Deloitte, LexiFi, etc. have adopted Tezos in their development environments and labs."

44.     However, on October 3, 2017, a spokeswoman for the accounting firm Ernst & Young told Reuters: "The statement is not correct. EY has not adopted Tezos."

45.     A spokesman for Deloitte said Tezos' code is "one of many technologies we're considering" with blockchain, but it's "still early stage and we haven't used the technology for a client project."

46.     Jean-Marc Eber, CEO of the French software company LexiFi, said: "The sentence, as stated, isn't accurate and unfortunately exaggerated, to say the least." While there had been "informal contacts," he said, "at this stage, LexiFi has not adopted Tezos' technology in its development environment or labs."

47.     The May 5 Reuters article was widely republished throughout California and the rest of the United States.

48.     The Tezos website also exaggerated the development of the Tezos project. For example, one of the reasons given as the "rationale" for the Breitman's compensation, is that:

> A large subset of the projects conducting fundraisers (sometimes called "ICOs") today are based on little more than a white paper and will remain in a development phase for years. Participants in those fundraisers have no idea how much of their contributions will be spent bringing those projects to fruition - if they ever reach that point. In contrast, Tezos established a working testnet in February 2017 which can be accessed upon request to assess the state of the completion of the Tezos project. Most of the remaining development consists of performing security audits and improving the test coverage of the project so it can confidently launch as a public blockchain.

49.     In a May 19, 2017 blog post, Arthur Breitman wrote that the he believed the Tezos team could reasonably launch the Tezos network "in a three to four months period . . ." Giving his worst-case projection, Breitman continued, "[i]t's entirely within the realm of possibility that the project takes up to 6 months to ship. Based on my assessment of the remaining development . . . that does not seem *likely*, but it's not *impossible*."

50.     In June of 2017, the Tezos website similarly proclaimed that "[t]he development team estimates that the time to completion [of the Tezos network] is around 4 months."

9
**COMPLAINT**

51.     Five months have now passed and there is no sign that the Tezos network is anywhere near completion. In fact, according to Arthur Breitman, the network is now not expected to be complete until February 2018 at earliest—a full four months after the worst-case assessment he provided in the run up to the Tezos ICO. Defendants' statements regarding the progress of the Tezos network were thus materially false and misleading.

52.     The Tezos crowdfunding site also contained a PDF detailing what funds raised in the ICO would be used for based on the amount raised. The section, titled "If the foundation is endowed with …" details what the Foundation will do if it raises $6 million, $12 million, $20 million, "moonshot", or "mars-shot." Having raised well over 10 times $20 million, the foundation achieved its "mars-shot."

53.     Under this "mars-shot" scenario, the document claimed the foundation would:

- "Deploy and silo several teams of engineers to build different candidates for upgrades."
- "Sponsor a leading computer science department."
- "Acquire mainstream print and TV media outlets to promote and defend the use of cryptographic ledger in society."
- "Fund efforts to digitize and map transaction logic from traditional legal prose to a Tezos language."
- "Negotiate with a small nation-state the recognition of Tezos as one of their official state currencies, which would immediately give Tezos favorable treatment in terms of financial regulation. Attempt negotiations to purchase or lease sovereign land."

54.     Even under the less optimistic fundraising scenarios, the Foundation promised to:

- Grow its team to at least 15 members.
- Conduct three annual developer conferences.
- "Retain our counsel to start exploring, as a failsafe, alternative legal structure or advocacy for the Foundation beyond the swiss Cryptovalley."

- "Lobby municipalities and local government to use formally verified smart contracts as a form of binding legal contract."
- "Purchase a banking license and deploy the Tezos block as a backbone for business operations.  Experiment with automation using blockchain for basic processes."

55.     Plaintiff is informed and believes and based thereon alleges, that despite raising nearly $500 million, the Tezos Foundation has not undertaken any of these steps to promote the Tezos network or the use thereof.

56.     Plaintiff is informed and believes and based thereon alleges that the false and misleading statements described above were made to artificially increase demand for Tezzies during the Tezos ICO, thereby allowing the Tezos Foundation, DLS, and its shareholders to maximize the amount of funds raised.

### THE TEZOS ICO

57.     Contributors to the Tezos ICO were informed they would be allocated 5,000 Tezzies for each bitcoin contributed during the ICO. The Tezos ICO was uncapped, meaning that there was "no limit on the amount of contributions that [were] accepted." And to encourage rapid contributions, the ICO provided for "time-dependent bonus[es]."

58.     The Tezos website described these bonuses: "From 20% at the outset the bonuses will decrease progressively to 0% over four additional periods (15%, 10%, 5%, and 0%) lasting 400 Bitcoin blocks [approximately two days and eighteen hours] each." These bonuses had their intended effect, with the vast majority of purchases occurring the first few days of the ICO.

59.     The FAQ section of the Tezos website contained an entry instructing visitors on how to acquire Tezzies through the Tezos ICO. It was titled: "How do I acquire and store Tezos tokens during and after the fundraiser (sometimes called "ICO")?" And stated:

> During the fundraiser you will access https://crowdfund.tezos.com and follow instructions to create a wallet and download a backup of that wallet in the form of a pdf document. We recommend you print, or manually copy this file and place the document in a safe place. Once the Tezos network launches, you will be able to import this wallet into the Tezos client to access your tezzies.

60.     The Tezos ICO finally began on July 1, 2017. The Breitmans had wide-ranging expectations about how much they might raise.. In June, Kathleen Breitman told Reuters that about a year ago, when the price of bitcoin was lower, "we were like, 'Hey, we would be lucky if we get 20 million.'"

61.     When the ICO ended after 13 days, the project received about 65,703 bitcoins and 361,122 ether, worth approximately $232 million at the time. This digital currency is now worth about twice that—approximately $475 million.  Kathleen Breitman has since acknowledged that this significantly exceeded DLS' expectations, and acknowledged the obvious, stating: "that is a lot of money."

62.     According to the Tezos website, once certain conditions (including release of the Tezos main net) are met DLS shareholders will receive 8.5% of funds contributed during the ICO—approximately $40 million dollars. DLS shareholders will also receive 10% of all Tezzies in the genesis block—presently valued at approximately $100 million.

63.     Despite the substantial sums the Breitmans stand to gain, Kathleen Breitman described participating in the Tezos fundraiser as like contributing to a public television station and receiving "a tote bag" in return. "That's kind of the same thing here," she said.

64.     While the ICO's purported terms called the contributions "a non-refundable donation" and not a "speculative investment," Lead Plaintiff was not shown these terms at any stage during the ICO process, nor did he agree to them.  Plaintiff is informed and believes and based thereon alleges that the purported terms were not shown to other ICO participants.

65.     Moreover, this characterization of ICO contributions as a donation is directly contradicted by statements made by Defendants and the significant investments made by cryptocurrency hedge funds.

66.     DLS shareholder, Draper told Reuters that cryptocurrencies are commodities like pork bellies, and characterized acquiring Tezzies as a purchase rather than a donation. Asked earlier in October how much he donated during the Tezos fundraiser, he replied via email, "You mean how much I bought? A lot."

67.     Kathleen Breitman similarly revealed the absurdity of characterizing purchases made during the ICO as donations in a June 2017 interview, stating: "*We are selling* . .. rather the Foundation is recommending an allocation of tokens to the genesis block based on donations to a Swiss non-profit … *we are going to sell them* over the course, uh, rather have them up for donation for the course of two weeks …" (emphasis added).

### PLAINTIFF ANDREW BAKER'S CONTRIUBTION TO THE ICO

68.     Plaintiff Baker began investing in cryptocurrencies in March 2017.  Before buying Tezos he had bought primarily Ethereum and Bitcoin—the two largest cryptocurrencies.

69.     Baker saw some of the stories detailing Tezos' potential and read up on Tezos on its own site and various cryptocurrency blogs and podcasts.  In doing so he was exposed to many of the false statements described above.

70.     He determined that buying Tezzies was a worthwhile investment. This determination was based in large part on the repeated representations that the Tezos network would be operational by December 2017 at latest.

71.     On July 12, 2017, Baker logged onto the Tezos contribution website from his home network in San Diego, California and followed the contribution instructions (which are provided in this YouTube video https://www.youtube.com/watch?v=Uti8-1Y-Wkk).

72.     At no point in this process did Mr. Baker see or agree to the Tezos ICO's purported terms and conditions.

73.     The Tezos website provided Mr. Baker with a Bitcoin address to send funds to.  Mr. Baker then sent one Bitcoin (worth approximately $2,800 at the time) from an account on Coinbase, a cryptocurrency exchange based in San Francisco, California, to the address provided by the Tezos contribution website.  In return he was provided with a private key that he was informed would allow him to access his wallet (containing 5,000 Tezzies) when the Tezos network was launched.

74.     A signed certification from Mr. Baker is attached as **Exhibit B**.

### INFIGHTING AND MISUSE OF FUNDS

13

75.     Following the ICO, neither the Tezos Foundation nor DLS provided significant status updates to participants or the general public.

76.     Then, on or about October 18, 2017, Arthur Breitman published a blog post titled "The Path Forward" conceding that progress since the ICO "had fallen short of our expectations."

77.     According to Breitman's blog post, in early September, the Brietmans "became aware that the president of the Tezos Foundation, Johann Gevers, engaged in an attempt at self-dealing, misrepresenting to the board the value of a bonus he attempted to grant himself."

78.     The blog post concluded that "[o]ur current best estimate for shipping the [Tezos] main net is now February of 2018, through the firm date remains 'when it's ready'."

79.     Gevers responded to these accusations by stating that he would not step down and accusing Arthur Breitman of "attempted character assassination." He continued by describing the efforts to remove him by the Breitmans and the other board members as an "illegal coup."

80.     Gevers stated that the Breitmans had been trying to control the Tezos Foundation as if it were their own private entity. He said that by bypassing the Tezos Foundations' legal structure and interfering in its operations the Breitmans caused costly delays in developing and launching the network and currency. He further accused them of "unnecessarily putting the project at risk."

81.     The Breitmans and DLS have not transferred the company (or its intellectual property) to the Foundation as they said they would prior to the ICO.

82.     Tezos futures tumbled following this news, losing nearly 50 percent of their value.

**NO SAFE HARBOR**

83.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized and/or approved by an executive officer of DLS or the Tezos Foundation who knew that those statements were false when made.

## FIRST CAUSE OF ACTION

### (Unregistered Offer and Sale of Securities in Violation of Sections 5(a) and 5(c) of the Securities Act - against the Tezos Defendants)

84.     Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

85.     The Tezos Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

86.     No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

87.     By reason of the foregoing, each of the Tezos Defendants have violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

88.     As a direct and proximate result of the Tezos Defendants' unregistered sale of securities, Plaintiff and members of the class have suffered damages in connection with their respective purchases of Tezzies securities at the Tezos ICO.

## SECOND CAUSE OF ACTION

### (Fraud in the Offer or Sale of Securities in Violation of Section 17(a)(1) of the Securities Act - against the Tezos Defendants)

89.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

90.    The Tezos Defendants, in the offer and sale of Tezzies securities, by the use of the means and instruments of transportation and communication interstate commerce by the use of the mails, directly and indirectly, have employed devices, schemes and artifices to defraud.

91.    In the offer and sale of the Tezzies securities and as part of the scheme to defraud, the Tezos Defendants made false and misleading statements of material fact and omitted to state material facts to investors and prospective investors as more fully described above.

92.    The Tezos Defendants engaged in the conduct alleged herein knowingly or with reckless disregard for the truth.

93.    By reason of the foregoing, each of the Tezos Defendants have violated Sections 17(a)(1) of the Securities Act, 15 U.S.C. §§ 77q(a)(1).

94.    As a direct and proximate result of the Tezos Defendants' conduct, Plaintiff and members of the class have suffered damages in connection with their respective purchases of Tezzies securities at the Tezos ICO.

### THIRD CAUSE OF ACTION

**(Fraud in the Offer or Sale of Securities in Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act - against the Tezos Defendants)**

95.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

96.    As described above, the Tezos Defendants, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) obtained money or property by means of untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (b) engaged in

1    transactions, practices, or courses of business that operated or would operate as a fraud or deceit
2    upon the purchaser.

3        97.    The Tezos Defendants acted at least negligently with respect to the facts and
4    circumstances described above.

5        98.    By reason of the foregoing, each of the Tezos Defendants have violated Sections
6    17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3).

7        99.    As a direct and proximate result of the Tezos Defendants' conduct, Plaintiff and
8    members of the class have suffered damages in connection with their respective purchases of
9    Tezzies securities at the Tezos ICO.

10

11                              **FOURTH CAUSE OF ACTION**

12       **(False Advertising in Violation of Cal. Bus. & Prof. Code §§ 17500,** *et seq.* **- against all**
13                                      **Defendants)**

14       100.   Plaintiff, on behalf of himself and all others similarly situated, realleges and
15   incorporates herein by reference each and every allegation contained in the preceding paragraphs
16   of this Complaint, and further alleges as follows:

17       101.   Defendants operated an enterprise whereby they sought to raise funds through the
18   Tezos ICO.

19       102.   Defendants publicly disseminated advertising which was untrue or misleading in
20   that statements made regarding the status of the Tezos network, the relationship between DLS and
21   the Tezos Foundation, and what the funds would be used for.

22       103.   Defendants knew, or in the exercise of reasonable care should have known, that
23   these statements were untrue or misleading.

24       104.   As a direct and proximate result of Defendants' false advertisements, Plaintiff and
25   members of the class have suffered injury to their property. The false statements created greater
26   demand for Tezzies among members of the class than would have otherwise been the case. As a
27   result, Plaintiff and the class have suffered damages in an amount according to proof at trial.

28

                                          17

1

2

**FIFTH CAUSE OF ACTION**

3

**(Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* - against all**

4

**Defendants)**

5

106. Plaintiff, on behalf of himself and all others similarly situated, realleges and

6

incorporates herein by reference each and every allegation contained in the preceding paragraphs

7

of this Complaint, and further alleges as follows:

8

106. Defendants have committed acts of unfair competition, as defined by Business and

9

Professions Code section 17200 by making material misrepresentations and omissions in the run

10

up to, and during, the Tezos ICO.

11

107. These acts and practices, as described above, violate Business and Professions Code

12

section 17200 in each of the following respects:

13

(a)    Defendants' failure to register Tezzies as a security with the SEC prior to offering

14

them to the public in the Tezos ICO violates Sections 5(a) and 5(c) of the Securities Act

15

(15 U.S.C. §§ 77e(a) and 77e(c)), and consequently, constitutes an unlawful business act

16

of practice within the meaning of Business and Professions Code section 17200.

17

(b)    Defendants' material misstatements and omissions violate Section 17(a) the

18

Securities Act (15 U.S.C. §§ 77q(a)) and California's False Advertising Law (Bus. & Prof.

19

Code §§ 17200, *et seq.*), and consequently, constitutes an unlawful business act of practice

20

within the meaning of Business and Professions Code section 17200.

21

(c)    The harm to Plaintiff and members of the class outweighs the utility of Defendants'

22

policy/practice and, consequently, Defendants' practice constitutes an unfair business act

23

of practice within the meaning of Business and Professions Code section 17200.

24

(d)    Defendants' conduct threatens an incipient violation of consumer protection and

25

securities laws, including but not limited to those laws referenced in subparagraph (a)

26

above or violates the policy or spirit of such law or otherwise significantly threatens or

27

harms competition.

28

18

COMPLAINT

(e)     Defendants' misrepresentations and omissions regarding the Tezos project in the run up to, and during the Tezos ICO, were likely to mislead the general public, and consequently, constituted fraudulent business acts or practices within the meaning of Business and Professions Code section 17200.

(f)     Defendants' acts of untrue and misleading advertising, as more fully set forth in paragraphs 100-104, above, are by definition violations of Business and Professions Code section 17200.

108.   As a result of the aforementioned acts, Plaintiff and class members have lost money or property and suffered injury in fact.  Defendants received and continue to hold money and property belonging to Plaintiff and class members.

109.   Plaintiff and class members have no adequate remedy at law for the injuries which they have suffered and will continue to suffer in the future.

## SIXTH CAUSE OF ACTION

### (Alter Ego Liability - against the Tezos Defendants)

110.   Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint, and further alleges as follows:

111.   Plaintiff is informed and believes, and based thereon alleges, that at all times relevant hereto each of the Tezos Defendants were principal, agent, affiliate, manager, alter-ego, co-venturer, partner, surety, guarantor, officer, director or employee of the remaining Tezos Defendants and were at all times acting within the scope of such agency, affiliation, management, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged, with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately caused thereby.

112.   Plaintiff is informed and believes, and based thereon alleges, that there exists and, at all times mentioned herein, existed a unity of interest and ownership between and among the

Tezos Defendants, such that any individuality and/or separateness between the Tezos Defendants has ceased to exist.

113.  Plaintiff is informed and believes, and based thereon alleges, that the Tezos Defendants were mere shells, instrumentalities and conduits through which the Tezos Defendants carried on their business for the Breitmans' primary, if not sole, benefit.  DLS and the Tezos Foundation were and are controlled, dominated and operated by the Breitmans as their individual businesses and alter egos.

114.  Plaintiff is informed and believes, and based thereon alleges, that the Tezos Defendants intermingled their assets and obtained assets from other Tezos Defendants to suit their convenience and to evade U.S. regulations, liability to defrauded investors, payment of taxes, and other legitimate obligations.  The Tezos Defendants used their own assets and those of other Tezos Defendants for personal use, and obtained funds from other Tezos Defendants' business accounts for their own personal use.

115.  The facts of the case are such that an adherence to the fiction of separate entities would, under the circumstances, sanction a fraud and/or promote injustice because Plaintiff and the class, as victims of the Tezos Defendants' wrongdoing, would suffer injury.

116.  Plaintiff is therefore entitled to a judgment against the Tezos Defendants, jointly and severally, in a sum according to proof at trial, plus interest at the maximum rate allowed by law and reimbursement of costs.

## PRAYER

WHEREFORE, Plaintiff demands judgment on his behalf and that of the class as follows:

1.    This action may be maintained as a class action under California Code of Civil Procedure section 382 and California Rule of Court 3.670, *et seq.*, certifying Plaintiff as representative of the class and designating his counsel as counsel for the class;

2.    That the unlawful conduct alleged above be adjured and decreed to violate Sections 5(a), 5(c), and 17(a) of the Securities Act.

3.     The conduct of Defendants constitutes an unlawful, unfair, and/or fraudulent business practice within the meaning of California's Unfair Competition Law, California Business and Professions Code section 17200, *et seq.*;

4.     That judgment be entered against Defendants and in favor of Plaintiff and each member of the class he represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them;

5.     For rescission of Plaintiff and each member of the classes' purchase of Tezzies;

6.     For punitive damages;

7.     For pre and post-judgment interest;

8.     For equitable relief, including a judicial determination of the rights and responsibilities of the parties.

9.     For attorneys' fees;

10.    For costs of suit; and

11.    For such other and further relief as may be deemed just and proper.


Dated: October 23, 2017                    TAYLOR-COPELAND LAW

                                           By:_____
                                               James Q. Taylor-Copeland

                                           Attorney for Lead Plaintiff Andrew Baker

21
**COMPLAINT**

# Exhibit A

# Exhibit A

SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934

Release No. 81207 / July 25, 2017

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:
The DAO

## I.  Introduction and Summary

The United States Securities and Exchange Commission's ("Commission") Division of
Enforcement ("Division") has investigated whether The DAO, an unincorporated organization;
Slock.it UG ("Slock.it"), a German corporation; Slock.it's co-founders; and intermediaries may
have violated the federal securities laws.  The Commission has determined not to pursue an
enforcement action in this matter based on the conduct and activities known to the Commission
at this time.

As described more fully below, The DAO is one example of a Decentralized
Autonomous Organization, which is a term used to describe a "virtual" organization embodied in
computer code and executed on a distributed ledger or blockchain.  The DAO was created by
Slock.it and Slock.it's co-founders, with the objective of operating as a for-profit entity that
would create and hold a corpus of assets through the sale of DAO Tokens to investors, which
assets would then be used to fund "projects."  The holders of DAO Tokens stood to share in the
anticipated earnings from these projects as a return on their investment in DAO Tokens.  In
addition, DAO Token holders could monetize their investments in DAO Tokens by re-selling
DAO Tokens on a number of web-based platforms ("Platforms") that supported secondary
trading in the DAO Tokens.

After DAO Tokens were sold, but before The DAO was able to commence funding
projects, an attacker used a flaw in The DAO's code to steal approximately one-third of The
DAO's assets.  Slock.it's co-founders and others responded by creating a work-around whereby
DAO Token holders could opt to have their investment returned to them, as described in more
detail below.

The investigation raised questions regarding the application of the U.S. federal securities
laws to the offer and sale of DAO Tokens, including the threshold question whether DAO
Tokens are securities.  Based on the investigation, and under the facts presented, the Commission
has determined that DAO Tokens are securities under the Securities Act of 1933 ("Securities
Act") and the Securities Exchange Act of 1934 ("Exchange Act").[1]  The Commission deems it
appropriate and in the public interest to issue this report of investigation ("Report") pursuant to

---

[1]  This Report does not analyze the question whether The DAO was an "investment company," as defined under
Section 3(a) of the Investment Company Act of 1940 ("Investment Company Act"), in part, because The DAO never
commenced its business operations funding projects.  Those who would use virtual organizations should consider
their obligations under the Investment Company Act.

Section 21(a) of the Exchange Act[2] to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws. All securities offered and sold in the United States must be registered with the Commission or must qualify for an exemption from the registration requirements. In addition, any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration.

This Report reiterates these fundamental principles of the U.S. federal securities laws and describes their applicability to a new paradigm—virtual organizations or capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investment and the related offer and sale of securities. The automation of certain functions through this technology, "smart contracts,"[3] or computer code, does not remove conduct from the purview of the U.S. federal securities laws.[4] This Report also serves to stress the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces.

II.    **Facts**

   A.    <u>Background</u>

From April 30, 2016 through May 28, 2016, The DAO offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH"), a

---

[2]  Section 21(a) of the Exchange Act authorizes the Commission to investigate violations of the federal securities laws and, in its discretion, to "publish information concerning any such violations." This Report does not constitute an adjudication of any fact or issue addressed herein, nor does it make any findings of violations by any individual or entity. The facts discussed in Section II, *infra*, are matters of public record or based on documentary records. We are publishing this Report on the Commission's website to ensure that all market participants have concurrent and equal access to the information contained herein.

[3]  Computer scientist Nick Szabo described a "smart contract" as:

> a computerized transaction protocol that executes terms of a contract. The general objectives of smart contract design are to satisfy common contractual conditions (such as payment terms, liens, confidentiality, and even enforcement), minimize exceptions both malicious and accidental, and minimize the need for trusted intermediaries. Related economic goals include lowering fraud loss, arbitrations and enforcement costs, and other transaction costs.

*See* Nick Szabo, *Smart Contracts*, 1994, http://www.virtualschool.edu/mon/Economics/SmartContracts.html.

[4]  *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) ("[T]he reach of the [Securities] Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security'.''); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.").

virtual currency[5] used on the Ethereum Blockchain.[6]  As of the time the offering closed, the total ETH raised by The DAO was valued in U.S. Dollars ("USD") at approximately $150 million.

The concept of a DAO Entity is memorialized in a document (the "White Paper"), authored by Christoph Jentzsch, the Chief Technology Officer of Slock.it, a "Blockchain and IoT [(internet-of-things)] solution company," incorporated in Germany and co-founded by Christoph Jentzsch, Simon Jentzsch (Christoph Jentzsch's brother), and Stephan Tual ("Tual").[7]  The White Paper purports to describe "the first implementation of a [DAO Entity] code to automate organizational governance and decision making."[8]  The White Paper posits that a DAO Entity "can be used by individuals working together collaboratively outside of a traditional corporate form.  It can also be used by a registered corporate entity to automate formal governance rules contained in corporate bylaws or imposed by law."  The White Paper proposes an entity—a DAO Entity—that would use smart contracts to attempt to solve governance issues it described as inherent in traditional corporations.[9]  As described, a DAO Entity purportedly would supplant traditional mechanisms of corporate governance and management with a blockchain such that contractual terms are "formalized, automated and enforced using software."[10]

---

[5]  The Financial Action Task Force defines "virtual currency" as:

> a digital representation of value that can be digitally traded and functions as:  (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction. It is not issued or guaranteed by any jurisdiction, and fulfils the above functions only by agreement within the community of users of the virtual currency. Virtual currency is distinguished from fiat currency (a.k.a. "real currency," "real money," or "national currency"), which is the coin and paper money of a country that is designated as its legal tender; circulates; and is customarily used and accepted as a medium of exchange in the issuing country. It is distinct from e-money, which is a digital representation of fiat currency used to electronically transfer value denominated in fiat currency.

*FATF Report, Virtual Currencies, Key Definitions and Potential AML/CFT Risks*, FINANCIAL ACTION TASK FORCE (June 2014), http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potential-aml-cft-risks.pdf.

[6]  Ethereum, developed by the Ethereum Foundation, a Swiss nonprofit organization, is a decentralized platform that runs smart contracts on a blockchain known as the Ethereum Blockchain.

[7]  Christoph Jentzsch released the final draft of the White Paper on or around March 23, 2016.  He introduced his concept of a DAO Entity as early as November 2015 at an Ethereum Developer Conference in London, as a medium to raise funds for Slock.it, a German start-up he co-founded in September 2015.  Slock.it purports to create technology that embeds smart contracts that run on the Ethereum Blockchain into real-world devices and, as a result, for example, permits anyone to rent, sell or share physical objects in a decentralized way.  *See* SLOCK.IT, https://slock.it/.

[8]  Christoph Jentzsch, *Decentralized Autonomous Organization to Automate Governance Final Draft – Under Review*, https://download.slock.it/public/DAO/WhitePaper.pdf.

[9]  *Id.*

[10]  *Id.*  The White Paper contained the following statement:

> A word of caution, at the outset:  the legal status of [DAO Entities] remains the subject of active and vigorous debate and discussion.  Not everyone shares the same definition.  Some have said that [DAO Entities] are autonomous code and can operate independently of legal systems; others

3

B.  The DAO

"The DAO" is the "first generation" implementation of the White Paper concept of a DAO Entity, and it began as an effort to create a "crowdfunding contract" to raise "funds to grow [a] company in the crypto space."[11]  In November 2015, at an Ethereum Developer Conference in London, Christoph Jentzsch described his proposal for The DAO as a "for-profit DAO [Entity]," where participants would send ETH (a virtual currency) to The DAO to purchase DAO Tokens, which would permit the participant to vote and entitle the participant to "rewards."[12] Christoph Jentzsch likened this to "buying shares in a company and getting … dividends."[13]  The DAO was to be "decentralized" in that it would allow for voting by investors holding DAO Tokens.[14]  All funds raised were to be held at an Ethereum Blockchain "address" associated with The DAO and DAO Token holders were to vote on contract proposals, including proposals to The DAO to fund projects and distribute The DAO's anticipated earnings from the projects it funded.[15]  The DAO was intended to be "autonomous" in that project proposals were in the form of smart contracts that exist on the Ethereum Blockchain and the votes were administered by the code of The DAO.[16]

---

have said that [DAO Entities] must be owned or operate[d] by humans or human created entities. There will be many use cases, and the DAO [Entity] code will develop over time. Ultimately, how a DAO [Entity] functions and its legal status will depend on many factors, including how DAO [Entity] code is used, where it is used, and who uses it. This paper does not speculate about the legal status of [DAO Entities] worldwide. This paper is not intended to offer legal advice or conclusions. Anyone who uses DAO [Entity] code will do so at their own risk.

*Id.*

[11] Christoph Jentzsch, *The History of the DAO and Lessons Learned*, SLOCK.IT BLOG (Aug. 24, 2016), https://blog.slock.it/the-history-of-the-dao-and-lessons-learned-d06740f8cfa5#.5o62zo8uv.  Although The DAO has been described as a "crowdfunding contract," The DAO would not have met the requirements of Regulation Crowdfunding, adopted under Title III of the Jumpstart Our Business Startups (JOBS) Act of 2012 (providing an exemption from registration for certain crowdfunding), because, among other things, it was not a broker-dealer or a funding portal registered with the SEC and the Financial Industry Regulatory Authority ("FINRA").  *See Regulation Crowdfunding: A Small Entity Compliance Guide for Issuers*, SEC (Apr. 5, 2017), https://www.sec.gov/info/smallbus/secg/rccomplianceguide-051316.htm; *Updated Investor Bulletin: Crowdfunding for Investors*, SEC (May 10, 2017), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_crowdfunding-.html.

[12] *See* Slockit, *Slock.it DAO demo at Devcon1: IoT + Blockchain*, YOUTUBE (Nov. 13, 2015), https://www.youtube.com/watch?v=49wHQoJxYPo.

[13] *Id.*

[14] *See* Jentzsch, *supra* note 8.

[15] *Id.*  In theory, there was no limitation on the type of project that could be proposed.  For example, proposed "projects" could include, among other things, projects that would culminate in the creation of products or services that DAO Token holders could use or charge others for using.

[16] *Id.*

4

On or about April 29, 2016, Slock.it deployed The DAO code on the Ethereum Blockchain, as a set of pre-programmed instructions.[17]  This code was to govern how The DAO was to operate.

To promote The DAO, Slock.it's co-founders launched a website ("The DAO Website"). The DAO Website included a description of The DAO's intended purpose: "To blaze a new path in business for the betterment of its members, existing simultaneously nowhere and everywhere and operating solely with the steadfast iron will of unstoppable code."[18]  The DAO Website also described how The DAO operated, and included a link through which DAO Tokens could be purchased.  The DAO Website also included a link to the White Paper, which provided detailed information about a DAO Entity's structure and its source code and, together with The DAO Website, served as the primary source of promotional materials for The DAO.  On The DAO Website and elsewhere, Slock.it represented that The DAO's source code had been reviewed by "one of the world's leading security audit companies" and "no stone was left unturned during those five whole days of security analysis."[19]

Slock.it's co-founders also promoted The DAO by soliciting media attention and by posting almost daily updates on The DAO's status on The DAO and Slock.it websites and numerous online forums relating to blockchain technology.  Slock.it's co-founders used these posts to communicate to the public information about how to participate in The DAO, including: how to create and acquire DAO Tokens; the framework for submitting proposals for projects; and how to vote on proposals.  Slock.it also created an online forum on The DAO Website, as well as administered "The DAO Slack" channel, an online messaging platform in which over 5,000 invited "team members" could discuss and exchange ideas about The DAO in real time.

### 1.    *DAO Tokens*

In exchange for ETH, The DAO created DAO Tokens (proportional to the amount of ETH paid) that were then assigned to the Ethereum Blockchain address of the person or entity remitting the ETH.  A DAO Token granted the DAO Token holder certain voting and ownership rights.  According to promotional materials, The DAO would earn profits by funding projects

---

[17]  According to the White Paper, a DAO Entity is "activated by deployment on the Ethereum [B]lockchain.  Once deployed, a [DAO Entity's] code requires 'ether' [ETH] to engage in transactions on Ethereum.  Ether is the digital fuel that powers the Ethereum Network."  The only way to update or alter The DAO's code is to submit a new proposal for voting and achieve a majority consensus on that proposal.  *See* Jentzsch, *supra* note 8.  According to Slock.it's website, Slock.it gave The DAO code to the Ethereum community, noting that:

> The DAO framework is [a] side project of Slock.it UG and a gift to the Ethereum community.  It consisted of a definitive whitepaper, smart contract code audited by one of the best security companies in the world and soon, a complete frontend interface.  All free and open source for anyone to re-use, it is our way to say 'thank you' to the community.

SLOCK.IT, https://slock.it.  The DAO code is publicly-available on GitHub, a host of source code.  *See The Standard DAO Framework, Inc., Whitepaper*, GITHUB, https://github.com/slockit/DAO.

[18]  The DAO Website was available at https://daohub.org.

[19]  Stephen Tual, *Deja Vu DAO Smart Contracts Audit Results*, SLOCK.IT BLOG (Apr. 5, 2016), https://blog.slock.it/deja-vu-dai-smart-contracts-audit-results-d26bc088e32e.

that would provide DAO Token holders a return on investment. The various promotional materials disseminated by Slock.it's co-founders touted that DAO Token holders would receive "rewards," which the White Paper defined as, "any [ETH] received by a DAO [Entity] generated from projects the DAO [Entity] funded." DAO Token holders would then vote to either use the rewards to fund new projects or to distribute the ETH to DAO Token holders.

From April 30, 2016 through May 28, 2016 (the "Offering Period"), The DAO offered and sold DAO Tokens. Investments in The DAO were made "pseudonymously" (i.e., an individual's or entity's pseudonym was their Ethereum Blockchain address). To purchase a DAO Token offered for sale by The DAO, an individual or entity sent ETH from their Ethereum Blockchain address to an Ethereum Blockchain address associated with The DAO. All of the ETH raised in the offering as well as any future profits earned by The DAO were to be pooled and held in The DAO's Ethereum Blockchain address. The token price fluctuated in a range of approximately 1 to 1.5 ETH per 100 DAO Tokens, depending on when the tokens were purchased during the Offering Period. Anyone was eligible to purchase DAO Tokens (as long as they paid ETH). There were no limitations placed on the number of DAO Tokens offered for sale, the number of purchasers of DAO Tokens, or the level of sophistication of such purchasers.

DAO Token holders were not restricted from re-selling DAO Tokens acquired in the offering, and DAO Token holders could sell their DAO Tokens in a variety of ways in the secondary market and thereby monetize their investment as discussed below. Prior to the Offering Period, Slock.it solicited at least one U.S. web-based platform to trade DAO Tokens on its system and, at the time of the offering, The DAO Website and other promotional materials disseminated by Slock.it included representations that DAO Tokens would be available for secondary market trading after the Offering Period via several platforms. During the Offering Period and afterwards, the Platforms posted notices on their own websites and on social media that each planned to support secondary market trading of DAO Tokens.[20]

In addition to secondary market trading on the Platforms, after the Offering Period, DAO Tokens were to be freely transferable on the Ethereum Blockchain. DAO Token holders would also be permitted to redeem their DAO Tokens for ETH through a complicated, multi-week (approximately 46-day) process referred to as a DAO Entity "split."[21]

2.    *Participants in The DAO*

According to the White Paper, in order for a project to be considered for funding with "a DAO [Entity]'s [ETH]," a "Contractor" first must submit a proposal to the DAO Entity. Specifically, DAO Token holders expected Contractors to submit proposals for projects that could provide DAO Token holders returns on their investments. Submitting a proposal to The DAO involved: (1) writing a smart contract, and then deploying and publishing it on the

---

[20] The Platforms are registered with FinCEN as "Money Services Businesses" and provide systems whereby customers may exchange virtual currencies for other virtual currencies or fiat currencies.

[21] According to the White Paper, the primary purpose of a split is to protect minority shareholders and prevent what is commonly referred to as a "51% Attack," whereby an attacker holding 51% of a DAO Entity's Tokens could create a proposal to send all of the DAO Entity's funds to himself or herself.

Ethereum Blockchain; and (2) posting details about the proposal on The DAO Website, including the Ethereum Blockchain address of the deployed contract and a link to its source code. Proposals could be viewed on The DAO Website as well as other publicly-accessible websites. Per the White Paper, there were two prerequisites for submitting a proposal. An individual or entity must: (1) own at least one DAO Token; and (2) pay a deposit in the form of ETH that would be forfeited to the DAO Entity if the proposal was put up for a vote and failed to achieve a quorum of DAO Token holders. It was publicized that Slock.it would be the first to submit a proposal for funding.[22]

ETH raised by The DAO was to be distributed to a Contractor to fund a proposal only on a majority vote of DAO Token holders.[23] DAO Token holders were to cast votes, which would be weighted by the number of tokens they controlled, for or against the funding of a specific proposal. The voting process, however, was publicly criticized in that it could incentivize distorted voting behavior and, as a result, would not accurately reflect the consensus of the majority of DAO Token holders. Specifically, as noted in a May 27, 2016 blog post by a group of computer security researchers, The DAO's structure included a "strong positive bias to vote YES on proposals and to suppress NO votes as a side effect of the way in which it restricts users' range of options following the casting of a vote."[24]

Before any proposal was put to a vote by DAO Token holders, it was required to be reviewed by one or more of The DAO's "Curators." At the time of the formation of The DAO, the Curators were a group of individuals chosen by Slock.it.[25] According to the White Paper, the Curators of a DAO Entity had "considerable power." The Curators performed crucial security functions and maintained ultimate control over which proposals could be submitted to, voted on, and funded by The DAO. As stated on The DAO Website during the Offering Period, The DAO relied on its Curators for "failsafe protection" and for protecting The DAO from "malicous [sic] actors." Specifically, per The DAO Website, a Curator was responsible for: (1) confirming that any proposal for funding originated from an identifiable person or organization; and (2)

---

[22] It was stated on The DAO Website and elsewhere that Slock.it anticipated that it would be the first to submit a proposal for funding. In fact, a draft of Slock.it's proposal for funding for an "Ethereum Computer and Universal Sharing Network" was publicly-available online during the Offering Period.

[23] DAO Token holders could vote on proposals, either by direct interaction with the Ethereum Blockchain or by using an application that interfaces with the Ethereum Blockchain. It was generally acknowledged that DAO Token holders needed some technical knowledge in order to submit a vote, and The DAO Website included a link to a step-by-step tutorial describing how to vote on proposals.

[24] By voting on a proposal, DAO Token holders would "tie up" their tokens until the end of the voting cycle. *See* Jentzsch, *supra* note 8 at 8 ("The tokens used to vote will be blocked, meaning they can not [sic] be transferred until the proposal is closed."). If, however, a DAO Token holder abstained from voting, the DAO Token holder could avoid these restrictions; any DAO Tokens not submitted for a vote could be withdrawn or transferred at any time. As a result, DAO Token holders were incentivized either to vote yes or to abstain from voting. *See* Dino Mark et al., *A Call for a Temporary Moratorium on The DAO*, HACKING, DISTRIBUTED (May 27, 2016, 1:35 PM), http://hackingdistributed.com/2016/05/27/dao-call-for-moratorium/.

[25] At the time of The DAO's launch, The DAO Website identified eleven "high profile" individuals as holders of The DAO's Curator "Multisig" (or "private key"). These individuals all appear to live outside of the United States. Many of them were associated with the Ethereum Foundation, and The DAO Website touted the qualifications and trustworthiness of these individuals.

confirming that smart contracts associated with any such proposal properly reflected the code the Contractor claims to have deployed on the Ethereum Blockchain. If a Curator determined that the proposal met these criteria, the Curator could add the proposal to the "whitelist," which was a list of Ethereum Blockchain addresses that could receive ETH from The DAO if the majority of DAO Token holders voted for the proposal.

Curators of The DAO had ultimate discretion as to whether or not to submit a proposal for voting by DAO Token holders. Curators also determined the order and frequency of proposals, and could impose subjective criteria for whether the proposal should be whitelisted. One member of the group chosen by Slock.it to serve collectively as the Curator stated publicly that the Curator had "complete control over the whitelist … the order in which things get whitelisted, the duration for which [proposals] get whitelisted, when things get unwhitelisted … [and] clear ability to control the order and frequency of proposals," noting that "curators have tremendous power."[26] Another Curator publicly announced his subjective criteria for determining whether to whitelist a proposal, which included his personal ethics.[27] Per the White Paper, a Curator also had the power to reduce the voting quorum requirement by 50% every other week. Absent action by a Curator, the quorum could be reduced by 50% only if no proposal had reached the required quorum for 52 weeks.

### 3.   Secondary Market Trading on the Platforms

During the period from May 28, 2016 through early September 2016, the Platforms became the preferred vehicle for DAO Token holders to buy and sell DAO Tokens in the secondary market using virtual or fiat currencies. Specifically, the Platforms used electronic systems that allowed their respective customers to post orders for DAO Tokens on an anonymous basis. For example, customers of each Platform could buy or sell DAO Tokens by entering a market order on the Platform's system, which would then match with orders from other customers residing on the system. Each Platform's system would automatically execute these orders based on pre-programmed order interaction protocols established by the Platform.

None of the Platforms received orders for DAO Tokens from non-Platform customers or routed its respective customers' orders to any other trading destinations. The Platforms publicly displayed all their quotes, trades, and daily trading volume in DAO Tokens on their respective websites. During the period from May 28, 2016 through September 6, 2016, one such Platform executed more than 557,378 buy and sell transactions in DAO Tokens by more than 15,000 of its U.S. and foreign customers. During the period from May 28, 2016 through August 1, 2016, another such Platform executed more than 22,207 buy and sell transactions in DAO Tokens by more than 700 of its U.S. customers.

---

[26]  Epicenter, *EB134 – Emin Gün Sirer And Vlad Zamfir: On A Rocky DAO*, YOUTUBE (June 6, 2016), https://www.youtube.com/watch?v=ON5GhIQdFU8.

[27]  Andrew Quentson, *Are the DAO Curators Masters or Janitors?*, THE COIN TELEGRAPH (June 12, 2016), https://cointelegraph.com/news/are-the-dao-curators-masters-or-janitors.

4.   *Security Concerns, The "Attack" on The DAO, and The Hard Fork*

In late May 2016, just prior to the expiration of the Offering Period, concerns about the safety and security of The DAO's funds began to surface due to vulnerabilities in The DAO's code.  On May 26, 2016, in response to these concerns, Slock.it submitted a "DAO Security Proposal" that called for the development of certain updates to The DAO's code and the appointment of a security expert.[28]  Further, on June 3, 2016, Christoph Jentzsch, on behalf of Slock.it, proposed a moratorium on all proposals until alterations to The DAO's code to fix vulnerabilities in The DAO's code had been implemented.[29]

On June 17, 2016, an unknown individual or group (the "Attacker") began rapidly diverting ETH from The DAO, causing approximately 3.6 million ETH—1/3 of the total ETH raised by The DAO offering—to move from The DAO's Ethereum Blockchain address to an Ethereum Blockchain address controlled by the Attacker (the "Attack").[30]  Although the diverted ETH was then held in an address controlled by the Attacker, the Attacker was prevented by The DAO's code from moving the ETH from that address for 27 days.[31]

In order to secure the diverted ETH and return it to DAO Token holders, Slock.it's co-founders and others endorsed a "Hard Fork" to the Ethereum Blockchain.  The "Hard Fork," called for a change in the Ethereum protocol on a going forward basis that would restore the DAO Token holders' investments as if the Attack had not occurred.  On July 20, 2016, after a majority of the Ethereum network adopted the necessary software updates, the new, forked Ethereum Blockchain became active.[32]  The Hard Fork had the effect of transferring all of the funds raised (including those held by the Attacker) from The DAO to a recovery address, where DAO Token holders could exchange their DAO Tokens for ETH.[33]  All DAO Token holders

---

[28]  *See* Stephan Tual, *Proposal #1-DAO Security, Redux*, SLOCK.IT BLOG (May 26, 2016), https://blog.slock.it/both-our-proposals-are-now-out-voting-starts-saturday-morning-ba322d6d3aea.  The unnamed security expert would "act as the first point of contact for security disclosures, and continually monitor, pre-empt and avert any potential attack vectors The DAO may face, including social, technical and economic attacks."  *Id.*  Slock.it initially proposed a much broader security proposal that included the formation of a "DAO Security" group, the establishment of a "Bug Bounty Program," and routine external audits of The DAO's code.  However, the cost of the proposal (125,000 ETH), which would be paid from The DAO's funds, was immediately criticized as too high and Slock.it decided instead to submit the revised proposal described above.  *See* Stephan Tual, *DAO.Security, a Proposal to guarantee the integrity of The DAO*, SLOCK.IT BLOG (May 25, 2016), https://blog.slock.it/dao-security-a-proposal-to-guarantee-the-integrity-of-the-dao-3473899ace9d.

[29]  *See TheDAO Proposal_ID 5*, ETHERSCAN, https://etherscan.io/token/thedao-proposal/5.

[30]  *See* Stephan Tual, *DAO Security Advisory: live updates*, SLOCK.IT BLOG (June 17, 2016), https://blog.slock.it/dao-security-advisory-live-updates-2a0a42a2d07b.

[31]  *Id.*

[32]  A minority group, however, elected not to adopt the new Ethereum Blockchain created by the Hard Fork because to do so would run counter to the concept that a blockchain is immutable.  Instead they continued to use the former version of the blockchain, which is now known as "Ethereum Classic."

[33]  *See* Christoph Jentzsch, *What the 'Fork' Really Means*, SLOCK.IT BLOG (July 18, 2016), https://blog.slock.it/what-the-fork-really-means-6fe573ac31dd.

who adopted the Hard Fork could exchange their DAO Tokens for ETH, and avoid any loss of the ETH they had invested.[34]

## III.   Discussion

The Commission is aware that virtual organizations and associated individuals and entities increasingly are using distributed ledger technology to offer and sell instruments such as DAO Tokens to raise capital. These offers and sales have been referred to, among other things, as "Initial Coin Offerings" or "Token Sales." Accordingly, the Commission deems it appropriate and in the public interest to issue this Report in order to stress that the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale. In this Report, the Commission considers the particular facts and circumstances of the offer and sale of DAO Tokens to demonstrate the application of existing U.S. federal securities laws to this new paradigm.

### A.   Section 5 of the Securities Act

The registration provisions of the Securities Act contemplate that the offer or sale of securities to the public must be accompanied by the "full and fair disclosure" afforded by registration with the Commission and delivery of a statutory prospectus containing information necessary to enable prospective purchasers to make an informed investment decision. Registration entails disclosure of detailed "information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered … ." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). "The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors." *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953)), *vacated on other grounds*, 446 U.S. 680 (1980). Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce. Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Thus, both Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce. 15 U.S.C. § 77e(a) and (c). Violations of Section 5 do not require scienter. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

---

[34] *Id.*

B.    DAO Tokens Are Securities

1.    *Foundational Principles of the Securities Laws Apply to Virtual Organizations or Capital Raising Entities Making Use of Distributed Ledger Technology*

Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b-77c. An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *see also United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."). This definition embodies a *"flexible rather than a static principle*, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299 (emphasis added). The test "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Id.* In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Housing Found.*, 421 U.S. at 849.

2.    *Investors in The DAO Invested Money*

In determining whether an investment contract exists, the investment of "money" need not take the form of cash. *See, e.g., Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) ("[I]n spite of *Howey's* reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract.").

Investors in The DAO used ETH to make their investments, and DAO Tokens were received in exchange for ETH. Such investment is the type of contribution of value that can create an investment contract under *Howey*. *See SEC v. Shavers*, No. 4:13-CV-416, 2014 WL 4652121, at *1 (E.D. Tex. Sept. 18, 2014) (holding that an investment of Bitcoin, a virtual currency, meets the first prong of *Howey*); *Uselton*, 940 F.2d at 574 ("[T]he 'investment' may take the form of 'goods and services,' or some other 'exchange of value'.") (citations omitted).

3.    *With a Reasonable Expectation of Profits*

Investors who purchased DAO Tokens were investing in a common enterprise and reasonably expected to earn profits through that enterprise when they sent ETH to The DAO's Ethereum Blockchain address in exchange for DAO Tokens. "[P]rofits" include "dividends, other periodic payments, or the increased value of the investment." *Edwards*, 540 U.S. at 394. As described above, the various promotional materials disseminated by Slock.it and its co-founders informed investors that The DAO was a for-profit entity whose objective was to fund

11

projects in exchange for a return on investment.[35]  The ETH was pooled and available to The DAO to fund projects.  The projects (or "contracts") would be proposed by Contractors.  If the proposed contracts were whitelisted by Curators, DAO Token holders could vote on whether The DAO should fund the proposed contracts.  Depending on the terms of each particular contract, DAO Token holders stood to share in potential profits from the contracts.  Thus, a reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment of ETH in The DAO.

### 4.    *Derived from the Managerial Efforts of Others*

#### a.    The Efforts of Slock.it, Slock.it's Co-Founders, and The DAO's Curators Were Essential to the Enterprise

Investors' profits were to be derived from the managerial efforts of others—specifically, Slock.it and its co-founders, and The DAO's Curators.  The central issue is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).  The DAO's investors relied on the managerial and entrepreneurial efforts of Slock.it and its co-founders, and The DAO's Curators, to manage The DAO and put forth project proposals that could generate profits for The DAO's investors.

Investors' expectations were primed by the marketing of The DAO and active engagement between Slock.it and its co-founders with The DAO and DAO Token holders.  To market The DAO and DAO Tokens, Slock.it created The DAO Website on which it published the White Paper explaining how a DAO Entity would work and describing their vision for a DAO Entity.  Slock.it also created and maintained other online forums that it used to provide information to DAO Token holders about how to vote and perform other tasks related to their investment.  Slock.it appears to have closely monitored these forums, answering questions from DAO Token holders about a variety of topics, including the future of The DAO, security concerns, ground rules for how The DAO would work, and the anticipated role of DAO Token holders.  The creators of The DAO held themselves out to investors as experts in Ethereum, the blockchain protocol on which The DAO operated, and told investors that they had selected persons to serve as Curators based on their expertise and credentials.  Additionally, Slock.it told investors that it expected to put forth the first substantive profit-making contract proposal—a blockchain venture in its area of expertise.  Through their conduct and marketing materials, Slock.it and its co-founders led investors to believe that they could be relied on to provide the significant managerial efforts required to make The DAO a success.

Investors in The DAO reasonably expected Slock.it and its co-founders, and The DAO's Curators, to provide significant managerial efforts after The DAO's launch.  The expertise of The DAO's creators and Curators was critical in monitoring the operation of The DAO, safeguarding investor funds, and determining whether proposed contracts should be put for a

---

[35]  That the "projects" could encompass services and the creation of goods for use by DAO Token holders does not change the core analysis that investors purchased DAO Tokens with the expectation of earning profits from the efforts of others.

vote. Investors had little choice but to rely on their expertise. At the time of the offering, The DAO's protocols had already been pre-determined by Slock.it and its co-founders, including the control that could be exercised by the Curators. Slock.it and its co-founders chose the Curators, whose function it was to: (1) vet Contractors; (2) determine whether and when to submit proposals for votes; (3) determine the order and frequency of proposals that were submitted for a vote; and (4) determine whether to halve the default quorum necessary for a successful vote on certain proposals. Thus, the Curators exercised significant control over the order and frequency of proposals, and could impose their own subjective criteria for whether the proposal should be whitelisted for a vote by DAO Token holders. DAO Token holders' votes were limited to proposals whitelisted by the Curators, and, although any DAO Token holder could put forth a proposal, each proposal would follow the same protocol, which included vetting and control by the current Curators. While DAO Token holders could put forth proposals to replace a Curator, such proposals were subject to control by the current Curators, including whitelisting and approval of the new address to which the tokens would be directed for such a proposal. In essence, Curators had the power to determine whether a proposal to remove a Curator was put to a vote.[36]

And, Slock.it and its co-founders did, in fact, actively oversee The DAO. They monitored The DAO closely and addressed issues as they arose, proposing a moratorium on all proposals until vulnerabilities in The DAO's code had been addressed and a security expert to monitor potential attacks on The DAO had been appointed. When the Attacker exploited a weakness in the code and removed investor funds, Slock.it and its co-founders stepped in to help resolve the situation.

    b.  DAO Token Holders' Voting Rights Were Limited

Although DAO Token holders were afforded voting rights, these voting rights were limited. DAO Token holders were substantially reliant on the managerial efforts of Slock.it, its co-founders, and the Curators.[37] Even if an investor's efforts help to make an enterprise profitable, those efforts do not necessarily equate with a promoter's significant managerial efforts or control over the enterprise. *See, e.g., Glenn W. Turner*, 474 F.2d at 482 (finding that a multi-level marketing scheme was an investment contract and that investors relied on the promoter's managerial efforts, despite the fact that investors put forth the majority of the labor that made the enterprise profitable, because the promoter dictated the terms and controlled the scheme itself); *Long v. Shultz*, 881 F.2d 129, 137 (5th Cir. 1989) ("An investor may authorize the assumption of particular risks that would create the possibility of greater profits or losses but still depend on a third party for all of the essential managerial efforts without which the risk could not

---

[36] DAO Token holders could put forth a proposal to split from The DAO, which would result in the creation of a new DAO Entity with a new Curator. Other DAO Token holders would be allowed to join the new DAO Entity as long as they voted yes to the original "split" proposal. Unlike all other contract proposals, a proposal to split did not require a deposit or a quorum, and it required a seven-day debating period instead of the minimum two-week debating period required for other proposals.

[37] Because, as described above, DAO Token holders were incentivized either to vote yes or to abstain from voting, the results of DAO Token holder voting would not necessarily reflect the actual view of a majority of DAO Token holders.

pay off."). *See also generally SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007) (finding an investment contract even where voting rights were provided to purported general partners, noting that the voting process provided limited information for investors to make informed decisions, and the purported general partners lacked control over the information in the ballots).

The voting rights afforded DAO Token holders did not provide them with meaningful control over the enterprise, because (1) DAO Token holders' ability to vote for contracts was a largely perfunctory one; and (2) DAO Token holders were widely dispersed and limited in their ability to communicate with one another.

First, as discussed above, DAO Token holders could only vote on proposals that had been cleared by the Curators.[38] And that clearance process did not include any mechanism to provide DAO Token holders with sufficient information to permit them to make informed voting decisions. Indeed, based on the particular facts concerning The DAO and the few draft proposals discussed in online forums, there are indications that contract proposals would not have necessarily provide enough information for investors to make an informed voting decision, affording them less meaningful control. For example, the sample contract proposal attached to the White Paper included little information concerning the terms of the contract. Also, the Slock.it co-founders put forth a draft of their own contract proposal and, in response to questions and requests to negotiate the terms of the proposal (posted to a DAO forum), a Slock.it founder explained that the proposal was intentionally vague and that it was, in essence, a take it or leave it proposition not subject to negotiation or feedback. *See, e.g., SEC v. Shields*, 744 F.3d 633, 643-45 (10th Cir. 2014) (in assessing whether agreements were investment contracts, court looked to whether "the investors actually had the type of control reserved under the agreements to obtain access to information necessary to protect, manage, and control their investments at the time they purchased their interests.").

Second, the pseudonymity and dispersion of the DAO Token holders made it difficult for them to join together to effect change or to exercise meaningful control. Investments in The DAO were made pseudonymously (such that the real-world identities of investors are not apparent), and there was great dispersion among those individuals and/or entities who were invested in The DAO and thousands of individuals and/or entities that traded DAO Tokens in the secondary market—an arrangement that bears little resemblance to that of a genuine general partnership. *Cf. Williamson v. Tucker*, 645 F.2d 404, 422-24 (5th Cir. 1981) ("[O]ne would not expect partnership interests sold to large numbers of the general public to provide any real partnership control; at some point there would be so many [limited] partners that a partnership vote would be more like a corporate vote, each partner's role having been diluted to the level of a single shareholder in a corporation.").[39] Slock.it did create and maintain online forums on which

---

[38] Because, in part, The DAO never commenced its business operations funding projects, this Report does not analyze the question whether anyone associated with The DAO was an "[i]nvestment adviser" under Section 202(a)(11) of the Investment Advisers Act of 1940 ("Advisers Act"). *See* 15 U.S.C. § 80b-2(a)(11). Those who would use virtual organizations should consider their obligations under the Advisers Act.

[39] The Fifth Circuit in *Williamson* stated that:

investors could submit posts regarding contract proposals, which were not limited to use by DAO Token holders (anyone was permitted to post). However, DAO Token holders were pseudonymous, as were their posts to the forums. Those facts, combined with the sheer number of DAO Token holders, potentially made the forums of limited use if investors hoped to consolidate their votes into blocs powerful enough to assert actual control. This was later demonstrated through the fact that DAO Token holders were unable to effectively address the Attack without the assistance of Slock.it and others. The DAO Token holders' pseudonymity and dispersion diluted their control over The DAO. *See Merchant Capital*, 483 F.3d at 758 (finding geographic dispersion of investors weighing against investor control).

These facts diminished the ability of DAO Token holders to exercise meaningful control over the enterprise through the voting process, rendering the voting rights of DAO Token holders akin to those of a corporate shareholder. *Steinhardt Group, Inc. v. Citicorp.*, 126 F.3d 144, 152 (3d Cir. 1997) ("It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negate the existence of an investment contract; where the duties assigned are so narrowly circumscribed as to involve little real choice of action … a security may be found to exist … . [The] emphasis must be placed on economic reality.") (citing *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 n. 14 (5th Cir. 1974)).

By contract and in reality, DAO Token holders relied on the significant managerial efforts provided by Slock.it and its co-founders, and The DAO's Curators, as described above. Their efforts, not those of DAO Token holders, were the "undeniably significant" ones, essential to the overall success and profitability of any investment into The DAO. *See Glenn W. Turner*, 474 F.2d at 482.

    C.    <u>Issuers Must Register Offers and Sales of Securities Unless a Valid Exemption Applies</u>

The definition of "issuer" is broadly defined to include "every person who issues or proposes to issue any security" and "person" includes "any unincorporated organization." 15 U.S.C. § 77b(a)(4). The term "issuer" is flexibly construed in the Section 5 context "as issuers devise new ways to issue their securities and the definition of a security itself expands." *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 909 (5th Cir. 1977); *accord SEC v. Murphy*, 626 F.2d 633, 644 (9th Cir. 1980) ("[W]hen a person [or entity] organizes or sponsors the organization of

---

A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venture that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson*, 645 F.2d at 424 & n.15 (court also noting that, "this is not to say that other factors could not also give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be effectively precluded.").

limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed, he will be considered an issuer … .").

The DAO, an unincorporated organization, was an issuer of securities, and information about The DAO was "crucial" to the DAO Token holders' investment decision. *See Murphy*, 626 F.2d at 643 ("Here there is no company issuing stock, but instead, a group of individuals investing funds in an enterprise for profit, and receiving in return an entitlement to a percentage of the proceeds of the enterprise.") (citation omitted). The DAO was "responsible for the success or failure of the enterprise," and accordingly was the entity about which the investors needed information material to their investment decision. *Id.* at 643-44.

During the Offering Period, The DAO offered and sold DAO Tokens in exchange for ETH through The DAO Website, which was publicly-accessible, including to individuals in the United States. During the Offering Period, The DAO sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million ETH, which was valued in USD, at the time, at approximately $150 million. Because DAO Tokens were securities, The DAO was required to register the offer and sale of DAO Tokens, unless a valid exemption from such registration applied.

Moreover, those who participate in an unregistered offer and sale of securities not subject to a valid exemption are liable for violating Section 5. *See, e.g., Murphy*, 626 F.2d at 650-51 ("[T]hose who ha[ve] a necessary role in the transaction are held liable as participants.") (citing *SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970); *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959); *SEC v. International Chem. Dev. Corp.*, 469 F.2d 20, 28 (10th Cir. 1972); *Pennaluna & Co. v. SEC*, 410 F.2d 861, 864 n.1, 868 (9th Cir. 1969)); *SEC v. Softpoint, Inc.*, 958 F. Supp 846, 859-60 (S.D.N.Y. 1997) ("The prohibitions of Section 5 … sweep[] broadly to encompass 'any person' who participates in the offer or sale of an unregistered, non-exempt security."); *SEC v. Chinese Consol. Benevolent Ass'n.*, 120 F.2d 738, 740-41 (2d Cir. 1941) (defendant violated Section 5(a) "because it engaged in selling unregistered securities" issued by a third party "when it solicited offers to buy the securities 'for value'").

D.     A System that Meets the Definition of an Exchange Must Register as a National Securities Exchange or Operate Pursuant to an Exemption from Such Registration

Section 5 of the Exchange Act makes it unlawful for any broker, dealer, or exchange, directly or indirectly, to effect any transaction in a security, or to report any such transaction, in interstate commerce, unless the exchange is registered as a national securities exchange under Section 6 of the Exchange Act, or is exempted from such registration. *See* 15 U.S.C. §78e. Section 3(a)(1) of the Exchange Act defines an "exchange" as "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood … ." 15 U.S.C. § 78c(a)(1).

Exchange Act Rule 3b-16(a) provides a functional test to assess whether a trading system meets the definition of exchange under Section 3(a)(1). Under Exchange Act Rule 3b-16(a), an

organization, association, or group of persons shall be considered to constitute, maintain, or provide "a marketplace or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange," if such organization, association, or group of persons: (1) brings together the orders for securities of multiple buyers and sellers; and (2) uses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.[40]

A system that meets the criteria of Rule 3b-16(a), and is not excluded under Rule 3b-16(b), must register as a national securities exchange pursuant to Sections 5 and 6 of the Exchange Act[41] or operate pursuant to an appropriate exemption. One frequently used exemption is for alternative trading systems ("ATS").[42] Rule 3a1-1(a)(2) exempts from the definition of "exchange" under Section 3(a)(1) an ATS that complies with Regulation ATS,[43] which includes, among other things, the requirement to register as a broker-dealer and file a Form ATS with the Commission to provide notice of the ATS's operations. Therefore, an ATS that operates pursuant to the Rule 3a1-1(a)(2) exemption and complies with Regulation ATS would not be subject to the registration requirement of Section 5 of the Exchange Act.

The Platforms that traded DAO Tokens appear to have satisfied the criteria of Rule 3b-16(a) and do not appear to have been excluded from Rule 3b-16(b). As described above, the Platforms provided users with an electronic system that matched orders from multiple parties to buy and sell DAO Tokens for execution based on non-discretionary methods.

## IV.   Conclusion and References for Additional Guidance

Whether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the

---

[40] *See* 17 C.F.R. § 240.3b-16(a). The Commission adopted Rule 3b-16(b) to exclude explicitly certain systems that the Commission believed did not meet the exchange definition. These systems include systems that merely route orders to other execution facilities and systems that allow persons to enter orders for execution against the bids and offers of a single dealer system. *See* Securities Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998) (Regulation of Exchanges and Alternative Trading Systems) ("Regulation ATS"), 70852.

[41] 15 U.S.C. § 78e. A "national securities exchange" is an exchange registered as such under Section 6 of the Exchange Act. 15 U.S.C. § 78f.

[42] Rule 300(a) of Regulation ATS promulgated under the Exchange Act provides that an ATS is:

> any organization, association, person, group of persons, or system: (1) [t]hat constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange within the meaning of [Exchange Act Rule 3b-16]; and (2) [t]hat does not: (i) [s]et rules governing the conduct of subscribers other than the conduct of subscribers' trading on such [ATS]; or (ii) [d]iscipline subscribers other than by exclusion from trading.

Regulation ATS, *supra* note 40, Rule 300(a).

[43] *See* 17 C.F.R. § 240.3a1-1(a)(2). Rule 3a1-1 also provides two other exemptions from the definition of "exchange" for any ATS operated by a national securities association, and any ATS not required to comply with Regulation ATS pursuant to Rule 301(a) of Regulation ATS. *See* 17 C.F.R. §§ 240.3a1-1(a)(1) and (3).

economic realities of the transaction.  Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission or to qualify for an exemption from the registration requirements of the federal securities laws.  The registration requirements are designed to provide investors with procedural protections and material information necessary to make informed investment decisions.  These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology.  In addition, any entity or person engaging in the activities of an exchange, such as bringing together the orders for securities of multiple buyers and sellers using established non-discretionary methods under which such orders interact with each other and buyers and sellers entering such orders agree upon the terms of the trade, must register as a national securities exchange or operate pursuant to an exemption from such registration.

To learn more about registration requirements under the Securities Act, please visit the Commission's website here.  To learn more about the Commission's registration requirements for investment companies, please visit the Commission's website here. To learn more about the Commission's registration requirements for national securities exchanges, please visit the Commission's website here.  To learn more about alternative trading systems, please see the Regulation ATS adopting release here.

For additional guidance, please see the following Commission enforcement actions involving virtual currencies:

- *SEC v. Trendon T. Shavers and Bitcoin Savings and Trust,* Civil Action No. 4:13-CV-416 (E.D. Tex., complaint filed July 23, 2013)

- *In re Erik T. Voorhees*, Rel. No. 33-9592 (June 3, 2014)

- *In re BTC Trading, Corp. and Ethan Burnside*, Rel. No. 33-9685 (Dec. 8, 2014)

- *SEC v. Homero Joshua Garza, Gaw Miners, LLC, and ZenMiner, LLC (d/b/a Zen Cloud)*, Civil Action No. 3:15-CV-01760 (D. Conn., complaint filed Dec. 1, 2015)

- *In re Bitcoin Investment Trust and SecondMarket, Inc.*, Rel. No. 34-78282 (July 11, 2016)

- *In re Sunshine Capital, Inc.*, File No. 500-1 (Apr. 11, 2017)

And please see the following investor alerts:

- *Bitcoin and Other Virtual Currency-Related Investments* (May 7, 2014)

- *Ponzi Schemes Using Virtual Currencies* (July 2013)

By the Commission.

# Exhibit B

# Exhibit B

## SWORN CERTIFICATION OF ANDREW BAKER

I, Andrew Baker, certify as follows:

1. I am a named plaintiff in the attached complaint and I have reviewed the complaint and authorized its filing.

2. I did not purchase the Tezzies securities that are the subject of this complaint at the direction of plaintiff's counsel or in order to participate in any private action.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. I purchased 5,000 Tezzies for one bitcoin (then valued at approximately $2,800) on July 12, 2017.

5. During the three year period preceding the date of this certification, I have not sought to serve as a representative party on behalf of the class.

6. I will not accept payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the Court under the law.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on October 25, 2017.

_____

Andrew Baker

CASE NUMBER: CGC-17-562144 ANDREW BAKER VS. DYNAMIC LEDGER SOLUTIONS, INC

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

| | |
|---|---|
| **DATE:** | **MAR-28-2018** |
| **TIME:** | **10:30AM** |
| **PLACE:** | **Department 610** |
| | **400 McAllister Street** |
| | **San Francisco, CA 94102-3680** |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

### ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**
(SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3869

See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.

 **Superior Court of California, County of San Francisco**
**Alternative Dispute Resolution**
**Program Information Package** 

> The plaintiff must serve a copy of the ADR Information package
> on each defendant along with the complaint. (CRC 3.221(c))

## WHAT IS ADR?

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to court.

## WHY CHOOSE ADR?

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial." (Local Rule 4)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

## HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet)
- Indicating your ADR preference on the Case Management Statement (also attached to this packet); or
- Contacting the court's ADR office (see below) or the Bar Association of San Francisco's ADR Services at 415-782-8905 or www.sfbar.org/adr for more information.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA  94102
415-551-3869

*Or, visit the court ADR website at www.sfsuperiorcourt.org*

The San Francisco Superior Court offers different types of ADR processes for general civil matters; each ADR program is described in the subsections below:

## 1) SETTLEMENT CONFERENCES

The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute early in the litigation process.

**(A) THE BAR ASSOCIATION OF SAN FRANCISCO (BASF) EARLY SETTLEMENT PROGRAM (ESP):** ESP remains as one of the Court's ADR programs (see Local Rule 4.3) but parties must select the program – the Court no longer will order parties into ESP.

**Operation:** Panels of pre-screened attorneys (one plaintiff, one defense counsel) each with at least 10 years' trial experience provide a minimum of two hours of settlement conference time, including evaluation of strengths and weakness of a case and potential case value. On occasion, a panelist with extensive experience in both plaintiff and defense roles serves as a sole panelist. BASF handles notification to all parties, conflict checks with the panelists, and full case management. The success rate for the program is 78% and the satisfaction rate is 97%. Full procedures are at: www.sfbar.org/esp.

**Cost:** BASF charges an administrative fee of $295 per party with a cap of $590 for parties represented by the same counsel. Waivers are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see enclosed brochure.

**(B) MANDATORY SETTLEMENT CONFERENCES:** Parties may elect to apply to the Presiding Judge's department for a specially-set mandatory settlement conference. See Local Rule 5.0 for further instructions. Upon approval of the Presiding Judge, the court will schedule the conference and assign the case for a settlement conference.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO,** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending.

**Operation:** Experienced professional mediators, screened and approved, provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. The BASF website contains photographs, biographies, and videos of the mediators as well as testimonials to assist with the selection process. BASF staff handles conflict checks and full case management. Mediators work with parties to arrive at a mutually agreeable solution. The success rate for the program is 64% and the satisfaction rate is 99%.

**Cost:** BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the administrative fee are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see the enclosed brochure.

**(B) JUDICIAL MEDIATION** provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at anytime throughout the litigation process.

**Operation:** Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge for the Judicial Mediation program.

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may elect any private mediator of their choice; the selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

## 3) ARBITRATION

An arbitrator is neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A) JUDICIAL ARBITRATION:** When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.

**Operation:** Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.2 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after the filing of a complaint. There is no cost to the parties for judicial arbitration.

**(B) PRIVATE ARBITRATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF TO ENROLL IN THE LISTED BASF PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF.



# Superior Court of California
## County of San Francisco



HON. JOHN K. STEWART
PRESIDING JUDGE

## Judicial Mediation Program

JENIFFER B. ALCANTARA
ADR ADMINISTRATOR

The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to personal injury, professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial Mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable Michael I. Begert
The Honorable Suzanne R. Bolanos
The Honorable Angela Bradstreet
The Honorable Andrew Y.S. Cheng
The Honorable Samuel K. Feng
The Honorable Charles F. Haines

The Honorable Harold E. Kahn
The Honorable Curtis E.A. Karnow
The Honorable Charlene P. Kiesselbach
The Honorable James Robertson, II
The Honorable Richard B. Ulmer, Jr.
The Honorable Mary E. Wiss

Parties interested in Judicial Mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program and deliver a courtesy copy to Department 610. A preference for a specific judge may be indicated on the request, and although not guaranteed, every effort will be made to fulfill the parties' choice. Please allow at least 30 days from the filing of the form to receive the notice of assignment. The court's Alternative Dispute Resolution Administrator will facilitate assignment of cases that qualify for the program.

Note: Space and availability is limited. Submission of a stipulation to Judicial Mediation does *not* guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3869

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and address)* | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: <br> ATTORNEY FOR *(Name):* | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: <br><br> DEPARTMENT 610 |
|---|---|

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Early Settlement Program of the Bar Association of San Francisco (BASF)** - Pre-screened experienced attorneys provide a minimum of 2 hours of settlement conference time for a BASF administrative fee of $295 per party. Waivers are available to those who qualify. BASF handles notification to all parties, conflict checks with the panelists, and full case management. www.sfbar.org/esp

☐ **Mediation Services of BASF** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days    ☐ 90-120 days    ☐ Other (please specify) _____

☐ **Other ADR process (describe)** _____

2) **The parties agree that the ADR Process shall be completed by (date):** _____

3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____

☐ *Additional signature(s) attached*

**STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

**CM-110**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| | |
| TELEPHONE NO.:                          FAX NO. *(Optional)*: | |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF**
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):*  ☐ **UNLIMITED CASE**           ☐ **LIMITED CASE** (Amount demanded  (Amount demanded is $25,000 exceeds $25,000)  or less) | |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:                              Time:                    Dept.:              Div.:                Room:

Address of court *(if different from the address above)*:

☐   Notice of Intent to Appear by Telephone,  by *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1.  **Party or parties** *(answer one):*
    a. ☐   This statement is submitted by party *(name)*:
    b. ☐   This statement is submitted **jointly** by parties *(names)*:

2.  **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
    a.   The complaint was filed on *(date)*:
    b. ☐   The cross-complaint, if any, was filed on *(date)*:

3.  **Service** *(to be answered by plaintiffs and cross-complainants only)*
    a. ☐   All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
    b. ☐   The following parties named in the complaint or cross-complaint
        (1) ☐   have not been served *(specify names and explain why not)*:

        (2) ☐   have been served but have not appeared and have not been dismissed *(specify names)*:

        (3) ☐   have had a default entered against them *(specify names)*:

    c. ☐   The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4.  **Description of case**
    a.   Type of case in  ☐  complaint   ☐  cross-complaint   *(Describe, including causes of action)*:

| Form Adopted for Mandatory Use Judicial Council of California CM-110 [Rev. July 1, 2011] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court, rules 3.720–3.730 www.courts.ca.gov |
|---|---|---|

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.  Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐  *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial.   *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐  The trial has been set for *(date):*
b.  ☐  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐  days *(specify number):*
b.  ☐  hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:                                          f.  Fax number:
e.  E-mail address:                                              g.  Party represented:
☐  Additional representation is described in Attachment 8.

9.  **Preference**
☐  This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**
a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

(1)  For parties represented by counsel: Counsel ☐ has ☐ has not   provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2)  For self-represented parties: Party ☐ has ☐ has not  reviewed the ADR information package identified in rule 3.221.

b.  **Referral to judicial arbitration or civil action mediation** (if available).

(1)  ☐  This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2)  ☐  Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3)  ☐  This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information):*

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply):* | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation):* |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date):*<br>☐ Agreed to complete mediation by *(date):*<br>☐ Mediation completed on *(date):* |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date):*<br>☐ Agreed to complete settlement conference by *(date):*<br>☐ Settlement conference completed on *(date):* |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date):*<br>☐ Agreed to complete neutral evaluation by *(date):*<br>☐ Neutral evaluation completed on *(date):* |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date):*<br>☐ Agreed to complete judicial arbitration by *(date):*<br>☐ Judicial arbitration completed on *(date):* |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date):*<br>☐ Agreed to complete private arbitration by *(date):*<br>☐ Private arbitration completed on *(date):* |
| (6) Other *(specify):* | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date):*<br>☐ Agreed to complete ADR session by *(date):*<br>☐ ADR completed on *(date):* |

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**
   a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:
   b. Reservation of rights: ☐ Yes   ☐ No
   c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

**12. Jurisdiction**
   Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.
   ☐ Bankruptcy  ☐ Other *(specify)*:
   Status:

**13. Related cases, consolidation, and coordination**
   a. ☐ There are companion, underlying, or related cases.
      (1) Name of case:
      (2) Name of court:
      (3) Case number:
      (4) Status:
      ☐ Additional cases are described in Attachment 13a.
   b. ☐ A motion to ☐ consolidate ☐ coordinate   will be filed by *(name party)*:

**14. Bifurcation**
   ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

**15. Other motions**
   ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

**16. Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

   Party                         Description                                                    Date

   c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20.** Total number of pages attached *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.



# Superior Court of California
## County of San Francisco

### Expedited Jury Trial Information Sheet

#### What is an expedited jury trial?

An expedited jury trial is a trial that is much faster and has a smaller jury than a traditional jury trial. An expedited jury trial differs from a regular jury trial in several ways:

- **The trial will be shorter.** Each side has 3 hours to make opening statements, present witnesses and evidence, and make closing statements.

- **The jury will be smaller.** There will be 8 jurors instead of 12.

- **Choosing the jury will be faster.** The parties will exercise fewer preemptory challenges.

- **Parties will waive some post trial motions and rights to appeal.** Appeals are allowed only if there is: (1) Misconduct of the judicial officer that materially affected substantial rights of a party; (2) Jury misconduct; or (3) Corruption or fraud or some other bad act that prevented a fair trial.

  In addition, parties may not ask the judge to set the jury verdict aside, except on those same grounds.

#### Does the jury have to reach a unanimous decision?

No. Just as in a traditional civil jury trial, only three-quarters of the jury must agree in order to reach a decision in an expedited jury trial. With 8 people on the jury, that means that at least 6 of the jurors must agree on the verdict in an expedited jury trial.

#### Is the decision of the jury binding on the parties?

Generally, yes. A verdict from a jury in an expedited jury trial is like a verdict in a traditional jury trial. However, parties who take part in expedited jury trials are allowed to make an agreement before the trial that guarantees that the defendant will pay a certain amount to the plaintiff even if the jury decides on a lower payment or no payment. That agreement may also impose a cap, or maximum, on the highest amount that a defendant has to pay, even if the jury decides on a higher amount. These agreements are commonly known as "high/low agreements."

#### How do I qualify for an expedited jury trial?

The process can be used in any civil case. To have an expedited jury trial, both sides must want one. Each side must agree that it will use only three hours to put on its case and agree to the other rules described above. This agreement must be put in writing in a Stipulation and submitted along with a Proposed Consent Order Granting an Expedited Jury Trial, which is given to the court for approval. The court will usually agree to the Consent Order.

#### How do I request an expedited jury trial?

To have an expedited jury trial, both sides must submit a Stipulation and Proposed Consent Order for Expedited Jury Trial to the court for approval. This may happen at three stages of litigation:

**1) At Filing and Prior to Setting of a Trial Date:** Parties may submit a Stipulation to Expedited Jury Trial to Dept. 610 using the attached short form (see below). Parties must

*Information adapted from Judicial Council's Expedited Jury Trial Information Sheet EJT-010-INFO, New January 1, 2011*

also submit a Proposed Consent Order for Expedited Jury Trial to Dept. 610.

2) **After a Trial Date has been Set**: Parties submit a Stipulation and Proposed Consent Order for Expedited Jury Trial directly to Dept. 206 at least *30 days* prior to the assigned trial date.

3) **After Trial Assignment**: A Proposed Consent Order for Expedited Jury Trial may be submitted immediately to the assigned trial department not less than *30 days* prior to the assigned trial date.

Also, after a case is assigned to a particular judge for trial, the parties may ask the trial judge to have an Expedited Jury Trial, and the judge may permit the parties to then sign the appropriate Stipulation and Proposed Consent Order for Expedited Jury Trial.

**Can I change my mind after agreeing to an expedited jury trial?**

No, unless the other side or the court agrees. Once you and the other side have agreed to take part in an expedited jury trial the agreement is binding on both sides.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### Expedited Jury Trial Request
*Please submit a copy of this request to Dept. 610.*

Case No. _____

Case Name: _____ v. _____

The parties would like this action to be submitted to an Expedited Jury Trial.

The parties shall submit a consent order to the Court on or by _____.

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Name of Party | Name of Party/Attorney | Signature of Party |
| | | Dated: _____ |
| _____ | _____ | _____ |
| Name of Party | Name of Party/Attorney | Signature of Party |
| | | Dated: _____ |
| _____ | _____ | _____ |
| Name of Party | Name of Party/Attorney | Signature of Party |
| | | Dated: _____ |

Please note: a [Proposed] Consent Order for Expedited Jury Trial is still required in addition to this stipulation form.

You can find the law and rules governing expedited jury trials in Code of Civil Procedure sections 630.01–630.12 and in rules 3.1545–3.1552 of the California Rules of Court. You can find these at any county law library or online. The statutes are online at *www.leginfo.ca.gov/calaw.html*. The rules are at *www.courts.ca.gov/rules*.

*Information adapted from Judicial Council's Expedited Jury Trial Information Sheet EJT–010–INFO, New January 1, 2011*